**U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| L.B., a minor, by and through | ) | |
| Next Friend, MICHAEL BUSCHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No: 2:18-cv-04060-BCW |
| | ) | |
| JEFFERSON CITY SCHOOL | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' SUGGETSIONS IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Jefferson City School District and Robert James, by and

through their attorneys, and pursuant to Federal Rule of Civil Procedure 56, and for their

Suggestions in Support of their Motion for Summary Judgment, state to the Court as follows:

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... 4

I.   Statement of Uncontroverted Facts ................................................................. 6

II.  Introduction ................................................................................................... 16

II.  Standard of Review ....................................................................................... 17

IV.  Argument ...................................................................................................... 17

   A. L.B.'s Missouri Human Rights Act claim (Counts I and II) ...................................... 17

      1. L.B. failed to timely exhaust administrative remedies required by §213.075, RSMo. ......................................................................................... 17

      2. L.B. did not exhaust her administrative remedies as to Defendant James ........ 19

      3. Count I fails to state a claim against the District because it is a political subdivision. ................................................................................. 20

      4. Count I fails to state a claim as a matter of law against Principal James ......... 22

      5. Count II fails to state a claim as a matter of law against the District. ............. 23

   B. L.B.'s State Law Negligence Claims (Counts III, IV, and V) ..................................... 24

      1. Principal James is entitled to official immunity ................................................ 24

      2. Principal James is immune from liability pursuant to 20 U.S.C. §§ 7941 – 7948, the Paul D. Coverdell Teacher Protection Act of 2001" ......................... 31

      3. Principal James is immune from liability pursuant to the Public Duty Doctrine .................................................................................................. 32

      4. Principal James was not involved in the dismissal of L.B., and therefore breached no duty .......................................................................... 33

   C. L.B.'s 42 U.S.C. § 1983 claim (Count VI) ................................................................. 33

      1. The District is not a "person" pursuant to 42 U.S.C. §1983 ........................... 33

      2. L.B.'s claims against Principal James are based solely on respondeat

superior. ........................................................................................................ 34

    3.   The District and Principal James are entitled to qualified immunity ............... 35

    4.   Principal James is immune from liability pursuant to the Coverdell Teacher

        Protect Act ................................................................................................ 36

**V.**   **Conclusion** ...................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Atkinson v. City of Mt. View,* 709 F.3d 1201 (8th Cir. 2013)…………….…………….…………34

*Alhalabi v. Mo. Dep't of Natural Res.*, 300 S.W.3d 518 (Mo. App. E.D.2009)...……………...19
20

*Ballard v. Heineman,* 548 F.3d 1132 (8th Cir. 2008) ................................................... 17

*Boever v. Special Sch. Dist. of St. Louis Co.*, 296 S.W.3d 487 (Mo. App. E.D. 2009) ............. 26

*Brady v. Curators of University of Missouri*, 213 S.W.3d 101 (Mo. App. E.D. 2006) .............. 22

*Clark v. YRC Freight*, 2016 U.S. Dist. LEXIS 29232

        (U.S.D.C., W.D. of MO, March 8, 2016) ................................................. 20

*Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238 (Mo. App. E.D. 2006) ............................ 22

*Dydell v. Taylor*, 332 S.W.3d 848 (Mo. banc 2011) ..................................................... 32

*Haley v. Bennett*, 489 S.W.3d 288 (Mo. App. W.D. 2016) .................................. 26, 27

*Hill v. Ford Motor Company*, 277 S.W.3d 659 (Mo. 2009) .................................. 20, 22

*Hughes v. Stottlemyre*, 454 F.3d 791 (8th Cir. 2006) ........................................... 34

*Humphries v. Pulaski Cnty. Special Sch. Dist.,* 580 F.3d 688 (8th Cir. 2009) ........................... 17

*Jackson v. Wilson*, 581 S.W.2d 39 (Mo. App. W.D. 1979) ........................................... 31

*Leeper v. Scorpio Supply IV, LLC*, 351 S.W.3d 784 (Mo. App. S.D. 2011) ............................. 22

*McCoy v. Martinez*, 480 S.W.3d 420 (Mo. App. E.D. 2016) ........................................ 27

*Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.,* 950 F.2d 566 (8th Cir. 1991) 17

*Norton v. Smith*, 782 S.W.2d 775 (Mo. App. 1989) ..................................................... 33

*Nguyen v. Grain Valley R-5 School District*, 353 S.W.3d 725 (Mo. App. W.D. 2011) ............. 25

*Pearson v. Callahan*, 129 S. Ct. 808 (2009) ..................................................................... 35

*Pollock v. Wetterau Food Distribution Group*, 11 S.W.3d 754 (Mo. App. 1999) ..................... 18

*Rhea v. Sapp*, 463 S.W.3d 370 (Mo. App. W.D. 2015) ................................................. 29

*Saucier v. Katz*, 533 U.S. 194 (2001) ........................................................................ 35

*State ex rel. Blue Springs School District v. Grate,*

        (Missouri Supreme Court Case SC97219, 2018).......................................... 21

*Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. banc 2008) ........................ 25, 26, 29, 32

*State ex rel. Tivol Plaza, Inc. v. Mo Comm'n on Human Rights*, 527 S.W.3d 837

        (Mo. banc 2017) ................................................................... 18, 19

*Tipler v. Douglas Cnty.*, 482 F.3d 1023 (8th Cir. 2007)................................................. 34

*Woods v. Ware*, 471 S.W.3d 385 (Mo. App. W.D. 2015) ............................................ 24, 25, 26

**Statutes**

§ 213.010, *et seq.*, RSMo............................................................................... 17, 23

§ 213.065, RSMo ..................................................................................... 20, 21, 22

§ 213.070, RSMo ....................................................................................... 23, 24

§ 213.075, RSMo ................................................................................ 17, 18, 19, 19

§ 213.111, RSMo .......................................................................................... 18, 19

4

20 U.S.C. §§ 7941-7948 ......................................................................................... 31

20 U.S.C. § 7943 ...................................................................................................... 32

20 U.S.C. § 7946 ................................................................................................. 31, 32

42 U.S.C. § 1983 ............................................................................................ 33, 34, 36

**Rules**

*Fed. R. Civ. P. 56(a)* ............................................................................................... 17

# I.  Statement of Uncontroverted Material Facts[1]

1. Plaintiff L.B. was a 16 year old female and sophomore student at Jefferson City High School ("JCHS") at all times relevant to this matter. *See* Doc. 28 at ¶ 1; ¶ 24.

2. Defendant Jefferson City School District (hereinafter "the District") is a public school district located within the State of Missouri. *See* Doc. 28 at ¶ 3.

3. Defendant Robert James at all time relevant to this matter was the Principal of JCHS. *See* Doc. 28 at ¶ 4.

4. JCHS is the high school of the District, and consists of grades 10 - 12. *See* Ex. 5 (deposition of Robert James) at p. 9, ln. 19 - 24.

5. The first incident in Plaintiff's complaint occurred on September 9, 2016. *See* Doc. 1 at ¶ 27-28.

6. On this date, L.B. knew that Jerome Buschman had called her out as this was something they had discussed ahead of time. *See* Ex. 1 (deposition of L.B.[2]) at p. 37, ln. 1-24.

7. L.B. expected to be excused that day by Jerome Buschman. *See* Ex. 1 at p. 37, ln. 25 – p. 38, ln. 2.

8. Jerome Buschman never came into the building to pick L.B. up. *See* Ex. 1 at p. 41, ln. 2-4.

9. Jerome Buschman told L.B., either over the phone or via text, that he would be calling her out that particular day. *See* Ex. 1 at p. 42, ln. 1-8.

10. L.B. did not report that to anyone with the school. *See* Ex. 1 at p. 42, ln. 9-11.

11. After Jerome Buschman called her out, she left the school building. *See* Ex. 1 at p.

---

[1] Facts are accepted as true by Defendants for purposes of this summary motion only.

[2] L.B. was 18 at the time of her deposition in this matter. See Ex. 1 at p. 5, ln. 11-12.

6

42, ln. 18-20.

12.    After being excused, L.B. drove away from the school and went to Jerome Buschman's house.  *See* Ex. 1 at p. 45, ln. 5-18.

13.    L.B. claims that when she went to Jerome's house, they had sexual intercourse for the first time.  *See* Doc. 28 at ¶ 32.

14.    After this encounter, L.B. continued to text with Jerome Buschman and did not report anything to anyone at the school about what had happened.  *See* Ex. 1 at p. 51, ln. 9-21.

15.    The next date mentioned in the First Amended Petition is September 23, 2016.  *See* Doc. 28 at ¶ 33.

16.    On that date, L.B. again knew that Jerome was the one calling her out of school. *See* Ex. 1 at p. 64, ln. 16-20.

17.    She did not tell anyone at the school that it was not one of her parents actually calling her out.  *See* Ex. 1 at p. 64, ln. 21-24.

18.    L.B. then left the school and went to Jerome Buschman's house, where they had sexual intercourse.  *See* Ex. 1 at p. 65, ln. 9-11; Doc. 28 at ¶ 35.

19.    L.B. told the police that the sex with Jerome Buschman was consensual.  *See* Ex. 1 at p. 65, ln. 24 - p. 66, ln. 2.

20.    L.B. testified that she knows the difference between consensual and non-consensual sex.  *See* Ex. 1 at p. 49, ln. 23-25.

21.    The third date described in the First Amended Petition is October 14, 2016.  *See* Doc. 28 at ¶ 36.

22.    On that date, L.B. again knew that Jerome Buschman was going to call her out that day, and knew it was him calling her out.  *See* Ex. 1 at p. 67, ln. 3-7.

7

23.    L.B. did not tell anyone with the school that it was not one of her parents calling her out that day.  *See* Ex. 1 at p. 67, ln. 8-10.

24.    L.B. left school property and went to Jerome Buschman's house where the two of them had sexual intercourse.  *See* Ex. 1 at p. 67, ln. 14-18; Doc. 28 at ¶ 38.

25.    The fourth incident mentioned in the First Amended Petition is November 11, 2016, when Jerome Buschman called the school and got L.B. excused for the entire day.  *See* Doc. 28 at ¶ 39.

26.    On that date, L.B. also knew that Jerome Buschman was going to be calling her out of school, as they had texted about that plan.  *See* Ex. 1 at p. 70, ln. 19-23.

27.    The two of them then went back to the Jerome Buschman's house and had sexual intercourse.  *See* Ex. 1 at p. 70, ln. 24-25; Doc. 28 at ¶ 42.

28.    On August 19 and December 15, 2016, before and after the incidents at issue in this lawsuit, L.B.'s mother called to excuse her out of school.  The procedure for being excused from school occurred the same way.  *See* Ex. 1 at p. 71, ln. 17-22.

29.    L.B. told her parents what was occurring between her and Jerome Buschman on January 20, 2017.  *See* Ex. 1 at p. 75, ln. 21 - 25; Doc. 28 at ¶ 44.

30.    L.B. sent sexually explicit messages to Jerome Buschman.  *See* Ex. 1 at p. 86, ln. 24 – p. 87, ln. 1.

31.    L.B. had no evidence that the school district knew it was Jerome Buschman calling to excuse her.  *See* Ex. 1 at p. 101, ln. 8-10.

32.    L.B. testified the procedure for her dismissal from school was no different than that of any other student.  *See* Ex. 1 at p. 101, ln. 17-24.

33.    L.B. did not observe any difference in how male students were excused from school

8

versus how female students were excused. *See* Ex. 1 at p. 102, ln. 36.

34.     L.B. knew JCHS' procedure for dismissal differed as to whether the parent came in the building or if they called in. *See* Ex. 1 at p. 104, ln. 12-18.

35.     L.B. also realizes the District's dismissal policy may differ based on the student's age. *See* Ex. 1 at p. 105, ln. 6-8.

36.     According to L.B., Principal James does not do anything to dismiss or excuse students from JCHS. *See* Ex. 1 at p. 106, ln. 10-16.

37.     L.B. did not have any information on Mr. James having any role in excusing her from school when Jerome Buschman called in. She did she have any knowledge of him actually taking any calls, nor was Mr. James the one who told her she was to be dismissed. *See* Ex. 1 at p. 106, ln. 17 – p. 107, ln. 10.

38.     L.B. feels that Principal James should have had a better policy because he is in charge of the school. *See* Ex. 1 at p. 107, ln. 16-19.

39.     L.B. testified that there was nothing Principal James did personally to discriminate against her on the basis of her gender. *See* Ex. 1 at p. 123, ln. 8-11.

40.     L.B. is not aware of anything that Principal James personally did to deny her any accommodations at school. *See* Ex. l at p. 123, ln. 1-3.

41.     L.B. did not do anything to tell the school district that it was Jerome Buschman calling her out and not her parents. *See* Ex. 1 at p. 142, ln. 10-13.

42.     Shelly Buschman is the mother of Libby Buschman. *See* Ex. 2 (deposition of Shelly Buschman) at p. 7, ln. 6-8.

43.     Shelly Buschman also has a son, Jarrod. *See* Ex. 1 at p. 7, ln. 9-13.

44.     According to L.B.'s mother, the dismissal procedure at JCHS was no different for

her son Jarrod than it was for L.B. *See* Ex. 2 at p. 34, ln. 16-25; p. 40, ln. 18 – p. 41, ln. 4.

45.     Shelly Buschman has no opinions as to what Principal James did wrong and had no conversations with him. *See* Ex. 2 at p. 84, ln. 20 – p. 85, ln. 1.

46.     Shelly Buschman agrees that Jerome Buschman took advantage of the school district. *See* Ex. 2 at p. 85, ln. 7-13.

47.     Michael Buschman is the father of L.B. *See* Doc. 28 at ¶ 2.

48.     Michael Buschman states that his wife is in a better position to speak on what the school routinely did with regards to call out procedures.  *See* Ex. 3 (deposition of Michael Buschman) at p. 20, ln. 7-10.

49.     Michael Buschman did not have any conversations with Robert James about the school's dismissal procedure. *See* Ex. 3 at p. 28, ln. 13-16.

50.     Michael Buschman has no knowledge of Mr. James ever personally dismissing L.B., or ever speaking with Jerome Buschman. *See* Ex. 3 at p. 61, ln. 20-25.[3]

51.     Michael Buschman does not have any reason to dispute that Jerome Buschman told the school Jerome was Michael when he called in. *See* Ex. 3 at p. 76, ln. 15-23.

52.     Michael Buschman agrees that he has no information that the school was aware that it was not him calling in to excuse L.B. from school on the four occasions at issue in this case. *See* Ex. 3 at p. 89, ln. 16 - p. 90, ln. 1.

53.     According to Jerome Buschman, the first sexual incident of any kind between him and L.B. occurred in the summer of 2016, at Jerome Buschman's residence. *See* Ex. 4 (deposition of Jerome Buschman) at p. 13, ln. 12 – p. 14, ln. 16.

_____

[3] During his deposition, Michael Buschman wanted to refer to Jerome Buschman as Jeb. *See* Exhibit 3 at page 30, line 9-22.

10

54.     Jerome Buschman performed oral sex on L.B. on a different occasion during the summer of 2016, before school started.  *See* Ex. 4 at p. 17, ln. 17 - p. 18, ln. 1.

55.     According to Jerome Buschman, he had sexual intercourse with L.B. before school started.  *See* Ex. 4 at p. 19, ln. 12 – p. 20, ln. 1.

56.     On the first date in question in which L.B. was excused from school, L.B. told Jerome Buschman told him to call in because they would automatically assume that he was her dad.  *See* Ex. 4 at p. 24, ln. 7 – p. 25, ln. 15.

57.     Jerome Buschman does not know who he spoke with on that occasion, but it was a female.  *See* Ex. 4 at p. 28, ln. 1-5.

58.     On the date of September 23, 2016, Jerome Buschman recalls calling in to excuse L.B. again.  *See* Ex. 4 at p. 30, ln. 21 – p. 31, ln. 7.

59.     On that date, L.B asked him to call in again as well, and Jerome Buschman spoke with a female to excuse her from school.  *See* Ex. 4 at p. 32, ln. 1-15.

60.     On the date of October 14, 2016, Jerome Buschman called into school to excuse L.B. and again spoke with a female.  *See* Ex. 4 at p. 37, ln. 1-11; p. 38, ln. 25 – p. 39, ln. 4.

61.     On November 11, 2016, Jerome Buschman called into the school to excuse L.B. at her request.  *See* Ex. 4 at p. 42, ln. 8-21.

62.     On this date, Jerome Buschman again spoke with a female at the school.  *See* Ex. 4 at p. 43, ln. 21-22.

63.     Jerome Buschman went to pick L.B. up, but never went on school property.  *See* Ex. 4 at p. 44, ln. 2-4.

64.     Additionally, L.B. would ask Jerome Buschman to meet her after work or meet her after school, and she would get in his truck, and they would make out.  *See* Ex. 4 at p. 46, ln. 20 –

11

p. 47, ln. 2.

65.     Jerome Buschman estimated this occurred 5-6 times, all of which L.B. was out of school already.  *See* Ex. 4 at p. 47, ln. 3-8.

66.     Jerome Buschman knew Michael and Shelly Buschman's address, phone numbers, and places of employment.  *See* Ex. 4 at p. 51, ln. 17 – p. 52, ln. 5.

67.     On all four occasions, Jerome Buschman and L.B. discussed Jerome calling into the school ahead of time.  *See* Ex. 4 at p. 54, ln. 2-5.

68.     Jerome Buschman pled guilty to one count of second degree statutory rape, and one count of second degree statutory sodomy, both of which are felonies.  *See* Ex. 4 at p. 60, ln. 20 through p. 61, ln. 1.

69.     Jerome Buschman is currently incarcerated at the Farmington Correctional Center. *See* Ex. 4 at p. 6, ln. 13-15.

70.     Jerome Buschman was 31 years old at the time he made the calls to the school to excuse L.B.  *See* Ex. 4 at p. 70, ln. 24 - p. 71, ln. 3.

71.     Jerome Buschman testified it was L.B.'s idea to get her out of school.  *See* Ex. 4 at p. 72, ln. 1-4.

72.     JCPS Board Policy JED, "Student Excuses and Absences", states: "The superintendent, with the assistance of the administrative and professional staff, shall establish, rules, regulations and procedures for student attendance within the district.  *See* Ex 8 (certified copies of JCPS business records) at p. 2.

73.     JCPS Board Policy JEDB, "Student Dismissal Precautions", states: "District Administrators will create student dismissal procedures that protect the safety of students while also addressing the necessary flow of traffic to and from the school."  *See* Ex 8 at p. 4.

12

74.     JCPS Board Policy JEDB states that these dismissal procedures "may vary depending on the age of the student." *See* Ex 8 at p. 4.

75.     JCPS Board Policy JEDB states that "At the request of a parent, school personnel will verify the identity of a parent or other authorized person before releasing the student." *See* Ex 8 at p. 4.

76.     JCPS Board Policy JEDB states that "District staff may refuse to release a student and will notify the principal if they have concerns regarding the student's safety or whether a person is authorized to transport the student. **Otherwise the district will assume the student knows with whom he or she may leave**." *See* Ex 8 at p. 4 (emphasis added).

77.     JCPS Board Policy JEDB states that "Students shall not be excused into any person's custody without the direct prior approval and knowledge of the building principal or designee. Each building principal will establish procedures to validate requests for early dismissal to assure that students are released only for proper reasons and only to authorized persons." *See* Ex 8 at p. 4.

78.     JCPS Board Policy JEDB states that "Students will only be released to the parent, guardian or designee of the parent or guardian or to other individuals or agencies as permitted or required by law." *See* Ex 8 at p. 4.

79.     JCPS Board Policy JEDB, goes on to state that "Telephone requests for early dismissal of a student shall be honored only if the call can be positively identified as the student's parent or guardian." *See* Ex 8 at p. 4.

80.     JCPS Board Policy JEDB then states that "Any person requesting release of a student must present proper identification prior to the release of the student." *See* Ex 8 at p.54.

81.     Principal James testified this last provision is for an in-person pickup of a student

13

only.  *See* Ex. 5 at p. 32, ln. 7 - 10.

82.     Many of the students in grades 10 – 12 can drive, so many parents never come into the building.  *See* Ex. 6 (Defendant James Responses to Plaintiff's First Interrogatories) at p. 3-4.

83.     JCPS Board Policy JEDB is restated in Section VI of the JCHS Handbook.  *See* Ex. 3 at p. 33 – 34.

84.     Principal James does not make policy decisions regarding the adoption of policies by the District.  *See* Ex. 5 at p. 10, ln. 8-23.

85.     Policy cannot be established by an administrator such as Principal James, it is only done by the School Board.  *See* Ex. 5 at p. 13, ln. 7-13.

86.     Principal James has delegated any responsibilities regarding the supplying of information to parents/guardians in regards to student absences and for submitting attendance information to the Superintendent's Office.  *See* Ex. 5 at p. 16, ln. 4 – p. 17, ln. 2.

87.     During the 2016-2017 school year, Principal James did not give prior approval for early dismissal himself, instead he had designees.  *See* Ex. 5 at p. 22, ln. 9-15.

88.     Principal James gave a directive to his staff that they are responsible for reading and being aware of the rules, procedures, and guidelines in JCHS' student and staff handbooks. *See* Ex. 5 at p. 28, ln. 9-16.

89.     The number of the person calling into JCHS would not display to the attendance secretary when they look at the phone.  *See* Ex. 5 at p. 38, ln. 10-19.

90.     Principal James testified that in the case of a phone call from a parent, JCHS positively identifies a caller when that individual presents information that would allow a prudent staff member to interpret as proper identification.  *See* Ex. 5 at p. 31, ln. 12 – p. 32, ln. 1-6.

91.     Principal James described the procedure for handling a call for early dismissal at

JCHS is that staff is to get enough information from the caller that they could positively identify the caller as being who they say they are. *See* Ex. 5 at p. 39, ln. 1-25.

92.     The caller would be asked for information such as full name, home address, and phone number. If the caller does not sound like an adult, or does not know basic information about the student, additional questions will be asked, which can include a parent's cell phone, parent's email, home address, student's date of birth, or parent's work number. *See* Ex. 6 at p. 3-4.

93.     If the caller struggles to provide any of that information, the individual is then asked for a contact number to verify that they are in fact the parent or guardian of the student in question. *See* Ex. 6 at p. 3-4.

94.     Following this procedure is what would constitute a "positively identified" caller in the context of Policy JEDB according to Principal James. *See* Ex. 6 at p. 3-4

95.     Additionally, the students attending Jefferson City High School are of an appropriate age to be able to discern the person(s) they are leaving with are approved by that student's parent or guardian. *See* Ex. 6 at p. 4.

96.     Michael Buschman agrees he signed the Missouri Commission on Human Rights ("MCHR") Charge of Discrimination form on May 11, 2017, on behalf of L.B. because she was a minor at the time. *See* Ex. 3 at p. 25, ln. 13-20; p. 26, ln. 7-9.

97.     Michael Buschman agrees that the most recent date of dismissal on the charge of discrimination was November 11, 2016. *See* Ex. 3 at p. 27, ln. 3-13; Ex. 7 (relevant documents from the investigative file of the Missouri Commission on Human Rights) at p. 6.

98.     Michael Buschman agrees that he did not specifically name Robert James on the charge of discrimination. *See* Ex. 3 at p. 27, ln. 14 through p. 28, ln. 4.

99.     Defendant JCPS responded that any allegation occurring more than 180 days prior

to the charge being filed must be dismissed as untimely pursuant to §213.075. *See* Ex. 7 at p. 7 - 10/

100. Plaintiff's attorney then requested a right to sue letter after 180 days had passed. *See* Ex. 7 at p. 5.

101. The MCHR issued a right to sue letter. *See* Ex. 7 at p. 2-3.

102. The right to sue letter stated that it was being issued because it had been requested, and also stated "**Please note that administrative processing of this complaint, including determination of jurisdiction, has not been completed**" (bold in original). *See* Ex. 7 at p. 2-3.

## II.     INTRODUCTION

At all relevant times to this cause of action, Plaintiff L.B. was a sophomore student at Jefferson City High School ("JCHS") during the 2016-17 school year. L.B. alleges that JCHS excused her from school on four occasions without the proper identification procedure being followed, when her 32 year-old adoptive cousin called JCHS pretending to be her father and asking that JCHS excuse her from school. L.B. alleges her adoptive cousin abused her after she left school property and drove to his house on these four occasions. L.B. brings suit against the District and JCHS Principal Bob James, claiming she was subjected to discrimination pursuant to the Missouri Human Rights Act, that Defendant James was negligent in not having policies and procedures regarding dismissal in place, and that the District and Principal James deprived her of her constitutional rights to a public education and to be free from discrimination based on her sex.

16

### III.    STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A genuine issue of material fact exists "if a reasonable jury could return a verdict for the party opposing the motion." *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009).  The Court must evaluate the facts in this case in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991).  However, "the nonmoving party may not rest on its pleadings; instead it must set forth specific facts showing there is a genuine issue of material fact for trial." *Ballard v. Heineman*, 548 F.3d 1132, 1135 (8th Cir. 2008).

### IV.    ARGUMENT

**A.  L.B.'s Missouri Human Rights Act ("MHRA") claims (Counts I and II).**

Counts I and II are both claims brought pursuant to the MHRA, Section 213.010, *et seq.*, RSMo.  Both claims fail as a matter of law because L.B. failed to timely file a charge of discrimination, because L.B. failed to name Principal James in that charge, because the District is a political subdivision against which claims cannot be brought, and because no discriminatory acts occurred.

1.    <u>L.B. failed to timely exhaust administrative remedies required by §213.075, RSMo.</u>

Section 213.075, RSMo, requires any person claiming to be aggrieved by an unlawful discriminatory practice to file a written verified complaint with the Missouri Commission on Human Rights ("MCHR") within 180 days of the alleged act of discrimination.  The filing requirements are subject to the continuing violation exception, which permits a plaintiff to recover

for acts of discrimination occurring prior to the 180-day filing period if the discrimination is a series of interrelated events. *Pollock v. Wetterau Food Distribution Group*, 11 S.W.3d 754, 762 (Mo. App. 1999).

The Charge of Discrimination ("Charge") filed in this matter states the most recent date of discrimination took place on November 11, 2017. SOF #97. Therefore, pursuant to § 213.075, RSMo, L.B. was required to file a charge of discrimination by May 10, 2017, or 180 days from November 11, 2017. But here L.B., through her father, filed a Charge with the MCHR on May 11, 2017. SOF #96. According to L.B.'s Charge, (and the facts alleged in this lawsuit), no other events occurred after November 11, 2017, to bring her claims within the 180 day filing period so as to have her claim fall under the continuing violation exception. L.B. therefore filed her Charge on the 181st day, and therefore did not properly exhaust her administrative remedies by timely filing a Charge with the MCHR. L.B.'s claims in Counts I and II must be dismissed in their entirety as untimely as a matter of law.

L.B. may argue that because the MCHR issued a right to sue letter, the MCHR determined it had jurisdiction over her claims. However, this argument has been specifically rejected by the Missouri Supreme Court in instances when, like in this case, a party requests a right to sue letter from the MCHR after 180 days has passed since the initial filing of the charge of discrimination. In *State ex rel. Tivol Plaza, Inc. v. Mo Comm'n on Human Rights*, 527 S.W.3d 837 (Mo. banc 2017), an individual filed a charge of discrimination against Tivol Plaza. Tivol Plaza responded that any allegation occurring more than 180 days prior to the charge being filed must be dismissed as untimely pursuant to § 213.075. *Id.* at 839. The individual's attorney requested a right to sue letter after 180 days had passed pursuant to § 213.111.1, RSMo, which the MCHR issued. *Id.* The right to sue letter stated that it was being issued because it had been requested, and also stated

18

"**Please note that administrative processing of this complaint, including determination of jurisdiction, has not been completed**".  *Id* (emphasis in original).  The Court stated that if an individual requests a right to sue letter after 180 days have passed, the MCHR is required to stop its investigation and issue a right to sue letter, and the MCHR loses all authority to further process the complaint pursuant to § 213.111.1, RSMo.  *Id*. at 843-44.  This was true even though the MCHR had not yet determined jurisdiction.  *Id*. at 845.

This case is identical to *Tivol*.  L.B. filed her Charge and the District responded that any allegation occurring more than 180 days prior to the charge being filed must be dismissed as untimely pursuant to §213.075.  SOF #99.  L.B.'s attorney then requested a right to sue letter after 180 days had passed, which the MCHR issued.  SOF #100; #101.  Just as in *Tivol*, the right to sue letter stated that it was being issued because it had been requested, and also stated "**Please note that administrative processing of this complaint, including determination of jurisdiction, has not been completed**".  SOF # 102 (bold in original).  Because L.B. requested a right to sue letter after 180 days had passed from the time she filed her Charge, the MCHR was statutorily required to stop its investigation and issue a right to sue letter pursuant to § 213.111.1, RSMo, even though the MCHR had not yet determined jurisdiction.  As stated above, there is no jurisdiction for these claims as a matter of law.

2. <u>L.B. did not exhaust her administrative remedies as to Defendant James.</u>

Principal James is named as a defendant in Count I, but the Charge filed by L.B. does not name him as a respondent.  Section 213.075.1, RSMo, states that a charge filed with the MCHR shall "set forth the particulars" of the unlawful discriminatory practice.  The MHRA requires that all administrative remedies be exhausted before petitioning the courts for relief.  *Alhalabi v. Mo. Dep't of Natural Res.*, 300 S.W.3d 518, 524 (Mo. App. E.D. 2009).  In order to exhaust all

19

administrative remedies, the claimant must give notice of all claims in the administrative complaint. *Id.* at 525. Accordingly, administrative remedies will be exhausted as to all incidents that are like or reasonably related to the allegations contained in the charges filed with the MCHR. *Id.* "The scope of the civil suit may be as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination." *Id.* The Missouri Supreme Court takes a liberal approach to fulfillment of procedural requirements under the MHRA. *Hill v. Ford Motor Company*, 277 S.W.3d 659, 670 (Mo. 2009).

Here, L.B's Charge does not contain any reference to Principal James. SOF #96. While the Charge refers to "school officials" who she claims violated the policy on early dismissal, the undisputed facts in this case are that Principal James had no role in dismissing L.B. L.B. admits Principal James did not have any role in excusing her from school. SOF #36. She was not aware of him actually taking any calls, nor was he the one who told her she was to be dismissed. SOF #37. L.B. also testified that there was nothing Principal James did to discriminate against her on the basis of her gender. SOF #39. She also is not aware of anything that Principal James did to deny her any accommodations at school. SOF #40. Therefore, L.B.'s own testimony indicates Principal James had no role in dismissing her from school, so it could not be reasonably expected that claims against Principal James could reasonably be expected to grow out of the Charge. L.B. has therefore failed to exhaust her administrative remedies against Principal James as required by §213.075.1, RSMo. *See Clark v. YRC Freight*, 2016 U.S. Dist. LEXIS 29232 (U.S.D.C., W.D. of MO, March 8, 2016).

3. Count I fails to state a claim against the District because it is a political subdivision.

Count I of L.B's First Amended Complaint is a claim brought against all Defendants, and alleges that they violated the MHRA by discriminating against L.B. on the basis of her sex. L.B.

has clarified in pleadings that this claim is being brought under §213.065, RSMo. *See* Doc. 35 at p. 2. This statute states that all persons in the state of Missouri are entitled to the equal use and enjoyment of any place of public accommodations, advantages, facilities, services, or privileges without discrimination because of their sex.

However, as the Court of Appeals for the Western District of Missouri recently held, such a claim cannot be brought against a political subdivision like the District. The District has previously filed a motion for judgment on the pleadings on this issue as to Count I, as well as Reply Suggestions in Support of that motion. *See* Docs 38 and 48. Defendants incorporate their arguments made in those respective filings as if fully set forth herein. For those reasons, the District is entitled to summary judgment on the claim in Count I because it is political subdivision against which claims of public accommodation cannot be brought under §213.065, RSMo.

Defendants are aware that the Missouri Supreme Court has accepted a motion for transfer in the *Grate* case. *See State ex rel. Blue Springs School District v. Grate*, (Missouri Supreme Court Case SC 97219). The motion for transfer filed in that matter asks that Court to review two issues – first, an issue relating to sovereign immunity, and second, the issue of a public school district not being a person. *See* Ex. 9 at p.1. As of the date of filing of this motion, the Missouri Supreme Court has not issued any notice as to what issue(s) will be reviewed.

Additionally, L.B. can point to no evidence in the summary judgment record that she was treated differently than other member of the opposite sex at JCHS regarding release procedures. L.B. testified the procedure for her dismissal from JCHS was no different than that of any other student, and she did not observe any difference in how male students were excused from school versus how female students were excused. SOF #33-34. L.B.'s mother testified the dismissal procedure at JCHS was no different for her son than it was for L.B. SOF #44. For all these reasons,

there was no discrimination towards L.B. on the basis of her gender, and she fails to state a claim for discrimination in Count I against the District.

4. <u>Count I fails to state a claim as a matter of law against Principal James.</u>

L.B.'s claim against Principal James in Count I also fails as a matter of law. As stated previously, L.B. also can point to no evidence in the summary judgment record that she was treated differently than any other member of the opposite sex at JCHS regarding release procedures, by Principal James or anyone else. Moreover, there is no evidence in the summary judgment record that Principal James was involved in any alleged discrimination. Missouri cases have only allowed for individual liability under the MHRA when the individuals directly oversaw or were actively involved in the discriminatory conduct. *See Hill v. Ford Motor Company*, 277 S.W.3d 659, 669 (Mo. banc 2009) (supervisory employee was allegedly involved in the retaliatory conduct); *Leeper v. Scorpio Supply IV, LLC*, 351 S.W.3d 784, 792 (Mo. App. S.D. 2011) (sole managing member was actively involved in each store's operation and he hired and directly supervised the alleged harasser); *Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 113 (Mo. App. E.D. 2006) (individual supervisors allegedly participated in the discrimination and retaliation); *Cooper v. Albacore Holdings, Inc*., 204 S.W.3d 238, 244 (Mo. App. E.D. 2006) (CEO allegedly sexually harassed plaintiffs).

Unlike the situations mentioned above, there is not material fact that supports a finding Principal James was personally involved in any alleged discriminatory conduct. Principal James did not have any role in excusing L.B. from school. SOF #36. He did not actually take any calls, nor was he the one who told her she was to be dismissed. SOF #37. There was nothing Principal James did personally to discriminate against L.B. on the basis of her gender. SOF #39. She also is not aware of anything that Principal James did to deny her any accommodations at school. SOF

#40. As it is undisputed Principal James was not personally involved in any alleged discriminatory acts, he is entitled to summary judgment as to Count I.

5. <u>Count II fails to state a claim as a matter of law against the District.</u>

L.B. has clarified in previous filings that the claim in Count II against the District is being brought pursuant to §213.070(3), RSMo. *See* Doc. 35 at p. 2. Section 213.070(3), RSMo, states that "It shall be an unlawful discriminatory practice: . . . (3) For the state or any political subdivision of this state to discriminate on the basis of race, color, religion, national origin, sex, ancestry, age, as it relates to employment, disability, or familial status as it relates to housing." Count II fails as a matter of law because there is no evidence in the summary judgment record that L.B. was treated any differently because of her gender.

L.B. claims she was subjected to unwelcome sexual harassment by her 32 year-old adoptive cousin, and that her gender was a contributing factor in that harassment. She alleges JCHS excused her from school without following the proper identification procedure, when her 32 year-old adoptive cousin called the high school pretending to be her father, and asking that JCHS excuse her from school. L.B. was then abused by her 32 year-old adoptive cousin at this house after being released from school. Her cousin was not an employee of the District. Therefore, any alleged harassment was committed by her 32 year-old adoptive cousin, and not by anyone employed by the District. L.B. also agrees that none of the abuse occurred on JCPS property, instead, it occurred at her cousin's house, after she left school. SOF #13; 18; 24; 27.

"Discrimination" is defined by the MHRA as "conduct proscribed herein, taken because of race, color, religion, national origin, ancestry, sex, or age as it relates to employment, disability, or familial status as it relates to housing." Section 213.010(6), RSMo. There is no evidence in the record that indicates L.B. was released from school because of her gender. While L.B. argues

proper procedures weren't followed, there is no evidence that any procedures weren't followed due to her gender. L.B.'s mother testified L.B. was dismissed from JCHS the same way as her brother. SOF #44. L.B. testified the procedure for her dismissal from JCHS was no different than that of any other student, and she did not observe any difference in how male students were excused from school versus how female students were excused. SOF #33-34. As such, L.B. fails to establish she was treated differently than any other student on the basis of her gender, and therefore fails to state a claim for discrimination on the basis of sex pursuant to § 213.070(3), RSMo.

**B. L.B.'s State Law Negligence Claims (Counts III, VI, and V).**

Counts III, IV and V are state law negligence claims brought against Principal James only. Count III alleges Principal James was negligent when he breached his duty to establish procedures to validate requests for early dismissal for students. *See* Doc. 28 at ¶ 66-67. Count IV alleges Principal James was negligent when he breached ministerial duties regarding the release of students which caused L.B. to be excused from school. *See* Doc. 28 at ¶ 71. Count V alleges Principal James was negligent when he failed to supervise L.B. and allowed her to be excused from school by Jerome Buschman. *See* Doc. 28 at ¶ 76-77. All these claims fail as a matter of law because they are barred by official immunity, the Coverdell Teacher Protection Act, and the public duty doctrine.

1. Principal James is entitled to official immunity.

Public school district employees like Principal James are, like other public employees, protected by official immunity. *See Woods v. Ware*, 471 S.W.3d 385, 391 (Mo. App. W.D. 2015); *Haley v. Bennett*, 489 S.W.3d 288, 295 (Mo. App. W.D. 2016). Official immunity is a judicially-created doctrine that "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary

acts." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008). Official immunity is intended to provide protection for these employees "who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties." *Id.* at 611. The goal of the doctrine is "to permit public employees to make judgments affecting public safety and welfare without concerns about possible personal liability." *Id.*

The key to official immunity is whether the public employee was performing a discretionary task, for which there is immunity, or a non-discretionary ministerial task, for which there is not. "A discretionary act requires the exercise of reason and discretion in determining how an act should be done or what course of action should be pursued." *Woods*, 471 S.W.3d at 392. A ministerial function, on the other hand, is one of a clerical nature that the employee "is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Id.* A public employee is only liable for a ministerial act if the conduct violates either a departmentally-mandated duty or a duty imposed by statute or regulation. *Nguyen v. Grain Valley R-5 School District*, 353 S.W.3d 725, 730 (Mo. App. W.D. 2011). A departmentally-mandated duty may arise from sources other than statutes or regulations, such as from departmental rules, the orders of a superior, or the nature of the employee's position. *Id.* While official immunity does not provide public employees immunity for torts committed when acting in a ministerial capacity, the definition of ministerial is limited. "A ministerial function is one which is of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion regarding the propriety of the act to be performed." *Woods*, 471 S.W.3d at 392. "In addition, in order to prescribe a ministerial duty, the statute or regulation must be

mandatory and not merely directory" and "must mandate a ministerial, not a discretionary, action."
*Boever v. Special Sch. Dist. of St. Louis Co.*, 296 S.W.3d 487, 492 (Mo. App. E.D. 2009). Whether
an act is discretionary must be determined "on a case-by-case basis, considering (1) the nature of
the public employee's duties; (2) the extent to which the act involves policymaking or exercise of
professional judgment; and (3) the consequences of not applying official immunity." *Southers,*
263 S.W.3d at 610.

In *Woods,* 471 S.W.3d at 395, the appellate court held that a high school coach "was
performing a discretionary act when he supervised and conducted the wrestling practice" that was
alleged to have injured the plaintiff. The plaintiff alleged that the wrestling coach's actions were
ministerial because he failed to follow both the school district and the Missouri State High School
Athletic Association's policies, bylaws, rules and regulations concerning the supervision of
students. *Id.* at 393. The appellate court specifically rejected that argument, finding that the
policies, bylaws, rules and regulations do not create a ministerial duty, but rather leave it to the
discretion of the coach to determine how to supervise students. *Id.* The court went on to say that
even assuming the school had adopted the policies, bylaws, rules and regulations relied on by the
plaintiff, the Missouri Supreme Court has held that "[p]ublic employees' conduct that is contrary
to applicable statutes or policies can constitute evidence that their conduct was negligent, but that
conduct does not remove their negligence from the protections of official immunity or public duty
doctrines where the provisions at issues indicate no intent to modify or supersede these common
law immunity protections." *Id.* at 395-96 (citing *Southers,* 263 S.W.3d at 617).

In *Haley*, 489 S.W.3d 288, the appellate court affirmed the granting of summary judgment
on the basis of official immunity to coaches who were sued for negligence caused by an injury at
a summer football camp that occurred under the coaches' supervision. The court noted that the

uncontroverted facts established that the coaches were "performing discretionary acts during the course of their official duties at the time [the plaintiff] was injured." *Id*. at 297. These discretionary acts included that the coaches decided who attended the camp, how long the football team would attend the camp, and how many games were played at the camp. *Id*. The court held that based on those facts, both coaches were entitled to official immunity for any alleged acts of negligence. *Id*.

The Eastern District Court of Appeals also found that teachers who were being sued for negligence as a result of injuries occurring at school were entitled to official immunity. In *McCoy v. Martinez*, 480 S.W.3d 420 (Mo. App. E.D. 2016), the plaintiff filed a claim for personal injury against her physical education teacher when she slipped and fell into a lunch table during her school physical education class. On a writ of prohibition, the court held that the teacher was a public official and that the acts alleged in the petition involved teaching decisions, which were discretionary acts, and the teacher was entitled to official immunity from liability. *Id.* at 425-426. The court also emphasized this point:

> [W]e would be remiss without stating that even in the most detailed 'school policy' concerning safety or gym class, we cannot imagine [the teacher's] acts or omissions in supervising students during an exercise activity were 'ministerial' rather than discretionary in nature, requiring the exercise of the teacher's judgment.

*Id*.

Here, the undisputed facts show that Principal James had discretion to establish a dismissal procedure for students at JCHS and used that discretion and judgment to implement a procedure for dismissal as part of his official duties, and is therefore entitled to official immunity as a matter of law on all negligence claims relating to the adequacy and application of that procedure.

In Count III, L.B. claims that Principal James breached his duty by failing to establish validation procedures for dismissal. JCPS Board Policy JEDB, "Student Dismissal Precautions", states: "District Administrators will create student dismissal procedures that protect the safety of

students while also addressing the necessary flow of traffic to and from the school", and "Each building principal will establish procedures to validate requests for early dismissal to assure that students are released only for proper reasons and only to authorized persons." SOF #73; 74. Policy JEDB also states that the dismissal procedures "may vary depending on the age of the student." SOF #74.

Defendants agree that Policy JEDB requires Principal James to establish a dismissal procedure. However, this policy gives Principal James discretion on how that dismissal procedure is actually carried out at JCHS. Principal James has discretion to use his professional judgment on how he thinks the dismissal policy should best be carried out in his particular building, and for his particular age group of students. Policy JEDB also states that "Telephone requests for early dismissal of a student shall be honored only if the call can be positively identified as the student's parent or guardian", but leaves discretion to each building principal on how exactly that is to be carried out, as there is no specific provision on how that is to be done. SOF #79. Because the policy does not specifically state what the dismissal procedure shall be, Principal James must use his professional judgment in implementing such a procedure. The record shows that Principal James had such a procedure in place.

Principal James did not give prior approval for early dismissal himself. SOF #87. Instead, the administrative staff is responsible for reading and being aware of the rules, procedures, and guidelines in JCHS' student and staff handbooks. SOF #88. Principal James testified that in the case of a phone call, JCHS positively identifies a caller when that individual presents information which would allow a prudent staff member to properly identify that individual as being who they say they are. SOF #90. The staff member is to get enough information from the caller that they could positively identify the caller as being who they say they are. SOF #91. To accomplish this,

the caller would be asked for information such as full name, home address, and phone number. SOF #92. If the caller does not sound like an adult, or does not know basic information about the student, additional questions will be asked, which can include a parent's cell phone, parent's email, home address, student's date of birth, or parent's work number. SOF #92. If the caller struggles to provide any of that information, the individual is then asked for a contact number to verify that they are in fact the parent or guardian of the student in question. SOF #93. Following this procedure is what would constitute a "positively identified" caller in the context of Policy JEDB according to Principal James. SOF #94.

L.B. might cite to portions of Board Policy JEDB which state "At the request of a parent, school personnel will verify the identity of a parent or other authorized person before releasing the student", and "Students will only be released to the parent, guardian or designee of the parent or guardian or to other individuals or agencies as permitted or required by law", to argue that Principal James was negligent because the policy was not allegedly followed in the four instances at issue. But such an argument is irrelevant to the official immunity analysis because the Missouri Supreme Court has held that "conduct that is contrary to applicable statutes . . . does not remove [a public employee's] negligence from the protections of official immunity. *See Southers*, 263 S.W.3d at 617. Simply put, the official immunity doctrine is unaffected by allegations of policy violations. *Rhea v. Sapp*, 463 S.W.3d 370, 379 (Mo. App. W.D. 2015) (court rejected argument that a departmental policy removed a fireman's discretion or otherwise rendered the fireman's activity ministerial). What is relevant to the analysis is that in this case, Principal James must use his discretion to implement a policy regarding dismissal procedures. He is a public official, and used his professional judgment and expertise to create a policy. He is therefore entitled to official

29

immunity and is immune from suit in negligence by L.B. in this case for the exercise of that discretion.

Moreover, Policy JEDB also states that "District staff may refuse to release a student and will notify the principal if they have concerns regarding the student's safety or whether a person is authorized to transport the student. **Otherwise the district will assume the student knows with whom he or she may leave**." SOF #76 (emphasis added). In this case, L.B. testified that on all four instances at issue, she knew she had been called out by Jerome Buschman and never told Principal James, or anyone else at the school, about it. L.B. was 16 years old at the time, and therefore of an appropriate age to be able to discern that Jerome Buschman was not someone approved by her parents. SOF #95. L.B. took no such action, and Principal James cannot be held liable for any alleged policy violations, when L.B. took no steps herself to alert anyone of the situation, despite being of an appropriate age to do so. This policy language gives Principal James, other District officials, the discretion to rely on the students themselves, unless there is an expressed concern regarding the student's safety.

In Count IV, L.B. alleges that Principal James was negligent in not following ministerial duties. But again, Principal James had discretion on how to implement the dismissal policy at JCHS. His actions in choosing how to implement such a policy were therefore not ministerial in nature. Likewise, the allegations in Count V that Principal James failed to supervise L.B. concern discretionary acts. Administrators have to use discretion in supervising students. As the Western District Court of Appeals stated "At first blush it might appear that the duty to keep the school grounds 'safe' is ministerial in character, but it is apparent on closer analysis that a great many circumstances may need to be considered in deciding what action is necessary to do so, and such decisions involve the exercise of judgment or discretion rather than the mere performance of a

30

prescribed task." *Jackson v. Wilson*, 581 S.W.2d 39, 44 (Mo. App. W.D. 1979). Any claim against Principal James for negligent supervision of L.B. concerns the use of discretion on the part of Principal James, and he is therefore entitled to official immunity on this claim as well.

2. <u>Principal James is immune from liability pursuant to 20 U.S.C. §§ 7941-7948, the "Paul D. Coverdell Teacher Protection Act of 2001".</u>

Defendant James is also entitled to summary judgment on the basis of the Coverdell Teacher Protection Act of 2001 (the "Act"), which states as follows:

(a) Liability Protection for Teachers

Except as provided in subsection (b) of this section, no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if –

(1)    the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;

(2)    the actions of the teacher were carried out in conformity with federal, state, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;

(3)    if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the state in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;

(4)    the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher; and

(5)    the harm was not caused by the teacher operating a motor vehicle, vessel, aircraft, or other vehicle for which the state requires the operator or the owner of the vehicle, craft, or vessel to –
   a.  possess an operator's license; or
   b.  maintain insurance.

20 U.S.C. § 7946(a).

The Coverdell Teacher Protection Act defines "teacher" as follows:

The term "teacher" means –

31

> (a)  a teacher, instructor, principal, or administrator;

20 U.S.C. § 7943(6).

The Supreme Court of Missouri has held that the Act is valid and enforceable in the State of Missouri.  *Dydell v. Taylor*, 332 S.W.3d 848, 850-858 (Mo. banc 2011).  Principal James, as the principal of JCHS, is a "teacher" pursuant to the Act.  The only remaining analysis is whether his actions or inactions are covered pursuant to 20 U.S.C. §§ 7941-7948.

Pursuant to § 7946(a) of the Act, Principal James is immune from liability if he was acting within the scope of his employment or responsibilities to the school in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school.  The scope of the Act has been shown to be expansive by the *Dydell* decision.  Here, the actions taken by Principal James in having a dismissal procedure for students in his building in place fall within the protection of the Act.  As explained above, it was within Principal James' professional discretion to decide what the particular dismissal procedure would be for students at JCHS. Based on the uncontroverted material facts, Principal James is absolutely immune from all causes of action alleging negligence pursuant to the Act.

3.  <u>Principal James is immune from liability pursuant to the Public Duty Doctrine.</u>

Principal James is also immune from liability under Counts III, IV, and V on the basis of the public duty doctrine which states that a public employee is not civilly liable for the breach of a duty owed to the general public, rather than a particular individual.  This public duty rule is based on the absence of a duty to the particular individual, as contrasted to the duty owed to the general public.  *Southers v. City of Farmington*, 263 S.W.3d 603, 611-12 (Mo. banc 2008).  The applicability of the public duty doctrine negates the duty element required to prove negligence, such that there can be no cause of action for injuries sustained as the result of an alleged breach of public duty to the community as a whole.  *Id*.  A breach of a duty owed by a public official only

to the general public will support no cause of action brought by an individual who is injured thereby. *Norton v. Smith*, 782 S.W.2d 775, 777 (Mo. App. 1989).

L.B.'s Complaint alleges that Principal James owed a duty to all students, not just L.B. *See* Doc. 28 at ¶ 66; ¶ 71; and ¶ 76. Thus, any alleged duty contained within Plaintiff's First Amended Complaint is not owed specifically to L.B., but rather to the public as a whole. As any alleged duty owed by Principal James was owed to the public as a whole, as a public official, he is entitled to the protections of the public duty doctrine and is immune from suit under the negligence claims in Counts III, IV, and V.

4. Principal James was not involved in the dismissal of L.B., and therefore breached no duty.

L.B. alleges in Count IV alleges that Principal James was negligent when he breached ministerial duties regarding the release of students which caused her to be released from school, and in Count V that he was negligent when he failed to supervise L.B. and allowed her to be dismissed from school. As stated previously in Section A(4) of this Argument section, the undisputed facts show that Principal James was not involved in any of the four dismissals at issue involving L.B. As a result, he had no involvement in the actions which L.B. alleges give rise to her causes of actions in Counts IV and V, and therefore breached no alleged duty owed to her. Principal James is therefore entitled to judgment as a matter of law on this additional basis.

**C. L.B.'s 42 U.S.C. § 1983 claim (Count VI)**

Count VI is a claim brought pursuant to 42 U.S.C. § 1983 against Defendants the District and James. L.B. alleges that these defendants deprived her of her constitutional rights to a public education and to be free from gender discrimination. *See* Document 28 at p.12, ¶ 82.

1. The District is not a "person" pursuant to 42 U.S.C. § 1983

"To establish a violation of § 1983, a plaintiff must show the deprivation was (1) a right secured by the Constitution and laws of the United States, and (2) caused by a person or persons acting under the color of state law." *Tipler v. Douglas Cnty.*, 482 F.3d 1023, 1027 (8th Cir. 2007). However, the District is not a "person" against whom §1983 claims can be brought. "[I]t is well established that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1214 (8th Cir. 2013). For this reason, the District should be granted summary judgment as to Count VI.

2.  L.B.'s claims against Principal James are based solely on *respondeat superior.*

    L.B. did not have any information on Principal James having any role in excusing her from school when Jerome Buschman called in; nor did she have any knowledge of him actually taking any calls, nor was Mr. James the one who told her she was to be dismissed. See Exhibit 1 at page 106, line 17 through page 107, line 10. L.B. feels that Mr. James should have had a better policy because he is in charge of the school. *See* Exhibit 1 at page 10, line 16-19. L.B. testified that there was nothing Principal James did personally to discriminate against her on the basis of her gender. See Exhibit 1 at page 23, line 8-11. She also is not aware of anything that Principal personally did to deny her any accommodations at school. See Exhibit 1 at page 123, line 1-3. Therefore, by L.B.'s own statements, her claim against Principal James is based solely on a theory of *respondeat superior* due to his role as Principal. But is well settled that § 1983 does not impose *respondeat superior* liability. *See Hughes v. Stottlemyre*, 454 F.3d 791, 798 (8th Cir. 2006). Principal James had no role personally in allegedly denying L.B. any education benefits, nor did he personally allegedly discriminate against her on the basis of gender. For these reasons, Defendant James is entitled to summary judgment on Plaintiff's claims against him in Count VI.

34

3. <u>The District and Principal James are entitled to qualified immunity.</u>

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id*. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Id*.

Courts employ a two-part inquiry to determine whether public officials are entitled to qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right; and (2) whether the right was "clearly established." A court has discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Id*. The "clearly established" inquiry asks "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

As stated above, L.B. has not asserted a viable claim for alleged deprivation of her constitutional rights. Assuming for the sake of argument that she did, the question becomes whether these rights were clearly established such that a reasonable official would have had fair warning that releasing her from school was unlawful. In 2016, when the events in this lawsuit occurred, the law was not clear so as to put Defendants on notice that releasing a sixteen year old high school student after an individual called in requesting that she leave school was a violation of that student's constitutional rights. Nor was it clear to put Principal James on notice that he

35

could be liable under a theory of *respondeat superior*.  Based on this, Defendants are entitled to qualified immunity.

4.  <u>Principal James is immune from liability pursuant to the Coverdell Teacher Protection Act.</u>

For the reasons set forth previously in Section B(2), Principal James is entitled to summary judgment on the basis of the Coverdell Teacher Protection Act of 2001.  As explained above, it was within Principal James' professional discretion to decide what the particular dismissal procedure would be for students at JCHS, and he is absolutely immune from any causes of action brought pursuant to 42 U.S.C. § 1983 pursuant to the Coverdell Teacher Protection Act.

## V.    CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment should be sustained.

WHEREFORE, Defendants pray that this Court enter Summary Judgment in their favor and against Plaintiff as to all Counts of Plaintiff's First Amended Complaint, and for such other relief as the Court deems just and proper under the circumstances.

Respectfully Submitted,

SCHREIMANN, RACKERS & FRANCKA, L.L.C.


/s/ Ryan Bertels
Chris Rackers, #41894
Ryan Bertels, #55167
931 Wildwood Drive, Suite 201
Jefferson City, MO 65109
573/634-7580
573/635-6034 (facsimile)
rb@srfblaw.com

Attorney for Defendants Jefferson City Public Schools and Robert James

36

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was served upon all parties of record, via the Court's filing system on October 26, 2018.

/s/ Ryan Bertels